| | | |
|---|---|---|
| IN RE TIVITY HEALTH, INC. STOCKHOLDER DERIVATIVE LITIGATION | ) ) ) | |
| ———————————————— | ) ) | |
| CHARLES DENHAM and ANDREW H. ALLEN, Derivatively on Behalf of TIVITY HEALTH, INC., | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | No. 3:18-cv-00087 (Consolidated with No. 3:18-cv-00797) |
| DONATO TRAMUTO, ADAM HOLLAND, GLENN HARGREAVES, KEVIN G. WILLS, BRADLEY S. KARRO, PAUL H. KECKLEY, CONAN J. LAUGHLIN, ROBERT GRECZYN, LEE A. SHAPIRO, ARCHELLE GEORGIOU, PETER HUDSON, and MARY JANE ENGLAND, | ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants, | ) ) | |
| -and- | ) ) | |
| TIVITY HEALTH, INC., a Delaware Corporation, | ) ) ) | |
| Nominal Defendant. | ) | |

## MEMORANDUM OPINION

This is the second time in the last six months where the Court has been called upon to address United Health Care Inc.'s entry into the fitness and health improvement market, and its impact on Tivity Health Inc.'s flagship SilverSneakers program. In an earlier case, <u>Weiner v. Tivity Health, Inc.</u>, 365 F. Supp. 3d 900 (M.D. Tenn. 2019), the Court found that a putative class of

shareholders had adequately pled materiality and scienter for purposes of the Private Securities Litigation Reform Act of 1995 ("PSLRA"), and hence refused to dismiss a complaint brought under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b) and 78t(a).

Most of the underlying factual background for this suit is the same as that set forth in this Court's earlier opinion, 365 F. Supp. 2d at 904-07, familiarity with which is assumed. This case differs, however, because it is a derivative action brought by two shareholders who purport to bring claims on Tivity's behalf against certain current and former officers and directors.

In a nutshell, Plaintiffs allege the following:

Tivity is a fitness benefit program broker: it enters into contracts with gym and fitness centers, then offers access to members of health insurance plans. The health insurance companies that run these plans in turn pay Tivity a fee. One of Tivity's largest customers is also one of the largest health insurance companies in the country, UHC. UHC alone contributed $94.6 million to Tivity's revenues in fiscal year 2017.

The Company focuses on consumers aged 50 and older through its SilverSneakers senior fitness program. The SilverSneakers program is the Company's largest and most profitable: fees paid from SilverSneakers clients constitute more than 80% of Tivity's annual revenues. But Tivity's business model is fragile. Its clients could, at any time, become its competitors, running their own fitness benefit programs.

This risk became a reality when, on November 6, 2017, UHC announced that it would offer its own fitness benefit program, Optum Fitness Advantage ("Optum"), to its members with a rollout to 11 states in January 2018. Industry analysts, including at Oppenheimer and Jeffries, immediately noted that UHC would in-source or convert members from SilverSneakers to UHC's Optum fitness program and convert or terminate UHC's contract with Tivity. Tivity felt the impact of losing one of its largest customers immediately. Tivity's stock dropped 34% the day this news was disclosed, wiping away over $650 million of market capitalization in one day. By early 2019, Tivity admitted that UHC's Optum program had a continuing detrimental effect on Tivity's revenues, downgrading its 2019 earnings guidance due to "reduction" in enrollees from UHC.

(Doc. No. 45 at 3-4) (internal citations omitted). Plaintiffs contend that, notwithstanding "their known fiduciary duties to be accurate and forthright in their communications with the public and

to act in the Company's best interests, the Individual Defendants approved and permitted public disclosures that misrepresented material facts about Tivity's contract renewal rates, future growth, and sustainability of its revenue stream." ( Id. at 1.). Put even more simply, "[w]hile continuously affirming supposed 'client penetration' and 'lots of momentum and lots of opportunity,' Defendants knew that Tivity would lose its major client, UHC[.]" (Id. at 1-2.).

The Amended Complaint (Doc. No. 35) asserts six causes of action against the individual Defendants, each of whom was a Tivity Board Member. Those claims are alleged violations of Section 10(b) (Count I), Section 14(a) (Count II), and Section 29(b) (Count III) of the Securities Exchange Act of 1934; breach of fiduciary duties (Count IV); waste of corporate assets (Count V); and unjust enrichment (Count VI). Defendants move for dismissal of the Amended Complaint in its entirety. That Motion (Doc. No. 39) will be granted.

## I. Derivative Actions – Applicable Rules

Derivative actions are governed by Rule 23.1 of the Federal Rules of Civil Procedure. So far as relevant, the rule provides:

> (a) Prerequisites. This rule applies when one or more shareholders or members of a corporation or an unincorporated association bring a derivative action to enforce a right that the corporation or association may properly assert but has failed to enforce. The derivative action may not be maintained if it appears that the plaintiff does not fairly and adequately represent the interests of shareholders or members who are similarly situated in enforcing the right of the corporation or association.

> (b) Pleading Requirements. The complaint must be verified and must:

> > (1) allege that the plaintiff was a shareholder or member at the time of the transaction complained of, or that the plaintiff's share or membership later devolved on it by operation of law;

> > (2) allege that the action is not a collusive one to confer jurisdiction that the court would otherwise lack; and

(3) state with particularity:

> (A) any effort by the plaintiff to obtain the desired action from the directors or comparable authority and, if necessary, from the shareholders or members; and

> (B) the reasons for not obtaining the action or not making the effort.

Fed. R. Civ. P. 23.1.

Although Rule 23.1 provides the pleading standard for derivative actions in federal court, the substantive rules for determining whether a plaintiff has satisfied that standard "is determined by state law." Kamen v. Kemper Fin. Servs., 500 U.S. 90, 105 (1991); see also, McCall v. Scott, 239 F.3d 808, 816 (6th Cir. 2001) ("The pleading requirement of Fed. R. Civ. P. 23.1 is the procedural embodiment of the substantive principle that a stockholder's right to prosecute a derivative suit is limited to situations in which demand is excused[.]")." Defendants argue that, under controlling Delaware law where Tivity is incorporated, Plaintiffs fail to meet the standing requirements of subsection 23.1(b)(1), and the demand requirements of subsection (b)(3).

## II. Rule 23.1(b)(1) – Contemporaneous Ownership Requirement

"Federal Rule of Civil Procedure 23.1 requires that the plaintiff in a derivative action demonstrate possession of an ownership interest in the company it seeks to represent that is contemporaneous with the conduct for which it seeks recovery." In re Facebook, Inc., Initial Pub. Offering Derivative Litig., 797 F.3d 148, 157 (2d Cir. 2015). "Failure to satisfy the contemporaneous ownership requirement of Rule 23.1 does not, of course, raise a jurisdictional issue under Article III." Id. "Rather, it means that the putative derivative plaintiff does not have standing to represent the interests of the nominal defendant in a derivative capacity." Id. (citing Berni v. Int'l Gourmet Rests. of Am., Inc., 838 F.2d 642, 646 (2d Cir.1988)).

4

In a one-page argument, Defendants assert that Plaintiffs lack standing to pursue their claims because they became Tivity stockholders in June 2017, but the conduct they complain of dates back to the beginning of 2017. "Because Plaintiffs were not Tivity shareholders at the time of each of the alleged wrongful acts of which they complain," Defendants submit, "their Complaint should be dismissed on this basis alone." (Doc. No. 40 at 10).

In an equally short response, Plaintiffs concede that they did not purchase stock until June 2017, but assert that "[t]he misrepresentations occurred from February 23, 2017 through October 26, 2017," and they have standing to sue for the misrepresentations that occurred after they purchased stock. (Doc. No. 47 at 9). They also argue that they have standing to challenge all of the misrepresentations because Tivity engaged in "continued wrongdoing."

Section 327 of the Delaware Code requires that the plaintiff be "a stockholder of the corporation at the time of the transaction of which [he or she] complains." Del. Code. Ann., Title 8 § 327. The statute was enacted to "restrict[] a stockholder's ability to sue for fiduciary wrongs that pre-dated his stock ownership," Quadrant Structured Prod. Co. v. Vertin, 102 A.3d 155, 178 (Del. Ch. 2014), and is intended "to prevent what has been considered an evil, namely, the purchasing of shares in order to maintain a derivative action designed to attack a transaction which occurred prior to the purchase of the stock," Parfi Holding AB v. Mirror Image Internet, Inc., 954 A.2d 911, 942 n.115 (Del. Ch. 2008). See also, Brambles USA, Inc. v. Blocker, 731 F. Supp. 643, 652 (D. Del. 1990) ("As a matter of policy, one who buys shares with knowledge of a purported wrongdoing should not be permitted to bring suit to challenge that wrongdoing.").

Defendants rely on Desimone v. Barrows, 924 A.2d 908 (Del. Ch. 2007) for the proposition that "under governing Delaware law, each stock transaction is looked at individually, and 'mere

allegations' that conduct 'of the same nature' continued when plaintiff did not own stock 'do not suffice to invoke the narrow continuing wrong exception to the clear statutory mandate that a derivative plaintiff must have owned stock at the time the transaction he attacks occurred in order to have standing to challenge that transaction on the corporation's behalf.'" (Doc. No 52 at 3-3 (quoting Desimone, 924 A.2d at 913). However, the complaint in Desimone "actually challenge[d] a number of discrete stock option grants – transactions that were completed the moment the grants were issued," and "[t]hose transactions did not continue into the time period of plaintiff's stock ownership." Desimone v. Barrows, 924 A.2d 908, 913 (Del. Ch. 2007). Here, in contrast, the Amended Complaint alleges a series of misrepresentations that continued through the time that Plaintiffs became stockholders, leading to a substantial decline in the stock value when the misrepresentations came to light. Desimone is therefore inapposite.

Defendants also quote Parfi as requiring that "the derivative plaintiff must 'have owned stock at the time *each* of the transaction of which it complains occurs.'" (Doc. No. 52 at 4) (emphasis by Defendant). However, the court in Parfi prefaced that statement with the word "ordinarily." 654 A.2d at 936. This prefatory word is important because, "in limited circumstances, Delaware courts have recognized an exception to the contemporaneous ownership requirement where there has been a 'continuing wrong.'" Blasband v. Rales, 971 F.2d 1034, 1045 (3d Cir. 1992) (collecting cases).

"Delaware courts strictly interpret the contemporaneous ownership rule and firmly enforce its requirements, in order to give effect to section 327's twin objectives of preventing strike suits and ensuring that a derivative plaintiff act in the corporation's best interest in prosecuting a claim." Conrad v. Blank, 940 A.2d 28, 41 (Del. Ch. 2007) (footnote omitted). At the same time, however, "it has been held that Section 327 'should be liberally construed in situations where its primary

purpose will not be frustrated thereby,' so as not to 'prevent reasonable opportunities to rectify corporate aberrations.'" (Id.) (citation omitted). "In this regard, Delaware courts acknowledge that some transactions that are attacked in complaints continue over a period of time and that persons who buy shares during that time have standing to sue." (Id.)

"The scope of the continuing wrong doctrine, as applied to § 327, has never been defined by Delaware courts with much precision [but Chancery Court] decisions do suggest that the doctrine is a narrow one that typically is applied only in unusual situations, such as where a plaintiff acquires his stock after a particular transaction has begun but before it is completed." Desimone, 924 A.2d at 924-25. "[I]n determining whether to grant derivative standing to a proposed plaintiff who acquired stock in the midst of the alleged wrongdoing, courts have . . . been particularly influenced by whether the proposed plaintiff knew of the wrongful conduct before purchasing his or her shares." In re Bank of New York Derivative Litig., 320 F.3d 291, 298 (2d Cir. 2003).

Narrow though the scope of the exception may be, Plaintiffs have sufficiently alleged that the various acts about which they complain are "so inexorably intertwined that there is but one continuing wrong." Ewing v. Beck, 520 A.2d 653, 662 (Del. 1987). Specifically, they claim that, beginning in early 2017, Defendants repeatedly touted its close relationship with UHC, never letting on that it was aware UHC was actually becoming, or had become, a director competitor. These acts or omissions continued until November 6, 2017 when UHC announced its entry into competition with SilverSneakers (in certain markets), long after Plaintiffs purchased shares. There is no suggestion that Plaintiffs were aware that Tivity was misrepresenting it relationship with UHC, or that Plaintiffs had any inkling that Tivity shares would drop by more than a third of its value when UHC made its announcement on November 6, 2017.

Moreover, Defendants have not shown why Plaintiffs lack standing to contest statements made after they became stockholders. See Desimone, 924 A.2d at 924 (finding that plaintiff had standing to challenge allegedly improper stock option grants after be became a stockholder, but not those occurring before he owned stock). Nor have Defendant demonstrated why Plaintiff would be precluded from relying upon those very same statements as a part of an ongoing scheme of deception. See In re CytRx Corp. Stockholder Derivative Litig. II, No. CV 11800-VCMR, 2017 WL 697656, at *4 (Del. Ch. Feb. 22, 2017) (finding that plaintiff who "purchased stock before seven of the thirteen Dream Team articles has standing to challenge those seven"; stating that plaintiff "potentially" had standing as to the remaining six; and noting that plaintiff might be entitled to recover the same damages "even if they have standing to challenge only seven of the Dream Team articles").

Accordingly, this case will not be dismissed for lack of standing.

## B. Rule 23.1(b)(3) – Demand Requirement

The purpose of a derivative action is "to place in the hands of the individual shareholder a means to protect the interests of the corporation from the misfeasance and malfeasance of 'faithless directors and managers,'" while at the same time preventing abuse by requiring shareholders to "demonstrate 'that the corporation itself had refused to proceed after suitable demand, unless excused by extraordinary conditions.'" Kamen, 500 U.S. at 94 (quoting Cohen v. Beneficial Loan Corp., 337 U.S. 541, 548 (1949)). By its terms, Rule 23.1 imposes a demand requirement and the possibility that this requirement may be excused, but does not define the scope of the requirement. To protect "the balance [States] have struck between the power of the individual shareholder and the power of the directors to control corporate litigation," a federal court "must apply the demand

futility exception as it is defined by the law of the State of incorporation." Id. at 103, 105.

"A basic premise of corporate governance under Delaware law is that the directors, rather than the shareholders, manage the business and affairs of the corporation." McCall, 239 F.3d at 816. That principle is codified. See Del. Code Ann. tit. 8, § 141 ("The business and affairs of every corporation organized under this chapter shall be managed by or under the direction of a board of directors . . ."). Nevertheless, under Delaware law a stockholder can pursue a derivative action if he or she "(a) has first demanded that the directors pursue the corporate claim and the directors have wrongfully refused to do so; or (b) establishes that pre-suit demand is excused because the directors are deemed incapable of making an impartial decision regarding the pursuit of the litigation." Wood v. Baum, 953 A.2d 136, 140 (Del. 2008). Plaintiffs concede in their Amended Complaint that they did not demand the directors pursue a claim against Tivity and so the pivotal question becomes whether that demand should be excused. Even construing the Amended Complaint in Plaintiffs' favor for purposes of the pending motion to dismiss, the Court finds that it should not.

Under Delaware law, a plaintiff can show demand futility under one of two tests. The Aronson v. Lewis, 473 A.2d 805 (Del. 1984) test "applies to claims involving a contested transaction i.e., where it is alleged that the directors made a conscious business decision in breach of their fiduciary duties." Wood, 953 A.2d at 140 (quoting Aronson, 473 A.2d at 814). The second test, announced in Rales v. Blasband, 634 A.2d 927 (Del.1993), "applies where the subject of a derivative suit is not a business decision of the Board but rather a violation of the Board's oversight duties." Id. (citing Rales, 634 A.3d at 934).

Because Plaintiffs in this case did not present a pre-suit demand to Tivity and they challenge the Board's oversight, the Rales test applies, and "requires that the plaintiff allege particularized

facts establishing a reason to doubt that 'the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand.'" Id. It is unnecessary for the Court to canvas Delaware law regarding how a plaintiff can challenge a director's independence and what it takes to plead independence for purposes of the Rales test, given the Second Circuit's recent exposition on the matter:

> A director will be considered unable to act objectively with respect to a presuit demand if he or she is interested in the outcome of the litigation or is otherwise not independent. Most obviously, a plaintiff can show that a given director is personally interested in the outcome of the litigation, in that the director will personally benefit or suffer as a result of the lawsuit. A plaintiff may also challenge a director's independence by ... rais[ing] a reasonable inference that a given director is dominated through a close personal or familial relationship or through force of will, or is so beholden to an interested director that his or her discretion would be sterilized. Moreover, directors can neither appear on both sides of a transaction nor expect to derive any personal financial benefit from it in the sense of self-dealing, as opposed to a benefit which devolves upon the corporation or all stockholders generally. In connection with this inquiry, the key principle . . . is that the directors are entitled to a presumption that they were faithful to their fiduciary duties. In the context of presuit demand, the burden is upon the plaintiff in a derivative action to overcome that presumption.

> Under Delaware law, the interestedness of the board must be assessed in a detailed, fact-intensive, director-by-director analysis. Delaware law does not permit the wholesale imputation of one director's knowledge to every other for demand excusal purposes. Rather, a derivative complaint must plead facts specific to each director, demonstrating that at least half of them could not have exercised disinterested business judgment in responding to a demand. Even so, the court must consider all the particularized facts pled by the plaintiffs about the relationships between the director and the interested party in their totality and not in isolation from each other.

> Finally, [a]t the pleading stage, a lack of independence turns on whether the plaintiffs have pled facts from which the director's ability to act impartially on a matter important to the interested party can be doubted because that director may feel either subject to the interested party's dominion or beholden to that interested party. Ultimately, we view the pled facts . . . in full context in making the . . . pleading stage determination of independence.

F5 Capital v. Pappas, 856 F.3d 61, 83-84 (2nd Cir. 2017) (internal citations and quotation marks

omitted).

Independence or impartiality is determined based upon the composition of the board at the time suit was filed. <u>Sandys v. Pincus</u>, 152 A.3d 124, 128 (Del. 2016). When the original Complaint was filed in this Court, the Tivity Board of Directors consisted of Donato Tramuto, Kevin G. Wills, Archelle Georgiou, Robert Greczyn, Peter Hudson, Bradley S. Karro, Paul H. Keckley, Conan J. Laughlin, and Lee A. Shapiro. This means, as Plaintiffs acknowledge, that they must "demonstrate that there is reason to doubt the disinterestedness or independence of five of these directors." (Doc. No. 45 at 12).

Plaintiffs have alleged particularized facts that raise a reasonable doubt concerning the impartiality of two board members – Tramuto and Laughlin. Tramuto served as Chief Executive Officer and President of Tivity since November 2015 and negotiated Tivity's contract with United Healthcare. Tramuto is a Defendant in the securities action, which sufficiently pled that he was responsible for public statements in press releases and SEC filing from March through November 2017 that failed to disclose United Healthcare's entry into the marketplace, and that he deflected inquires into the matter during conference calls. <u>See</u> <u>Pfeiffer v. Toll</u>, 989 A.2d 683, 690 (Del. Ch. 2010), abrogated on other grounds by <u>Kahn v. Kolberg Kravis Roberts & Co., L.P.</u>, 23 A.3d 831, 840 (Del. 2011) (impartiality can be shown where individual defendants are also named defendants in a companion federal securities action that survived motion to dismiss and alleged defendants made material misrepresentations and omissions of material facts).

Laughlin, a member of Tivity's Audit Committee since 2014 and also a named Defendant in the securities action, "sold 3,750,000 shares of Tivity stock for $122,925,000 proceeds through his investment firm, North Tide Capital, LLC." (Doc. No. 37, Amended Complaint ¶ 32). This was

allegedly done while he was in possession of material, nonpublic information concerning Tivity's true business health, and is sufficient to suggest partiality.  See Indiana Elec. Workers' Pension Tr. Fund IBEW v. Shaw Grp., Inc., 537 F.3d 527, 543 (5th Cir. 2008) (noting that stock sales may show knowledge if they occur in "suspicious amounts or at suspicious times," and that "[s]uspicion may be generated if the sales are out of line with prior trading practices or [made] at times calculated to maximize personal profit").[1]

This leaves Plaintiff three short of a majority, and seven Board members that, by operation of law, are presumed to be impartial.  See In re Walt Disney Co. Derivative Litig., 906 A.2d 27, 52 (Del. 2006) ("Our law presumes that in making a business decision the directors of a corporation acted on an informed basis, in good faith, and in the honest belief that the action taken was in the best interests of the company.").   In an effort to show otherwise, Plaintiffs treat the Board Members collectively because they attended the same meetings, and argue that "[d]espite their fiduciary duty to be truthful with stockholders, the Individual Defendants knowingly approved, permitted, and failed to correct misstatements that failed to disclose that Tivity was about to lose its contract with UHC, one of its largest customers, and would instead face increasing market competition as UHC performed the services previously offered by UHC." (Doc. No. 47 at 13).  Continuing on, Plaintiffs argue that "Defendants' knowledge of these false statements is supported by the Company's internal documents, which show the Board was well aware that UHC intended to expand its internal fitness benefits program, thus decimating Tivity's relationship with one of its largest customers and significantly reducing Tivity's relationship with one of its largest customers and significantly

---

[1] Plaintiffs also allege that Glenn Hargreaves, who has been Tivity's Chief Accounting Officer since July 2012 and was its Interim CFO from November 2015 to June 2017, sold  54,774 shares of Tivity stock for $2,073,825.35.  (Id. ¶ 23).  While Hargreaves is a Defendant in the Complaint, he apparently has never been a member of Tivity's Board.  (Doc. No. 40 at 15).

reducing Tivity's future revenues, growth prospects, and user base of its SilverSneakers program." Id.. All of this, Plaintiffs submit, somehow shows that the remaining board members – Wills (Tivity's Chairman of the Board and the Chief Financial Officer of Coach, Inc.); Karro (a Principal of Hillcote Advisors, a firm focused on investing in and restructuring healthcare companies); Keckley (a 35-year veteran of the health care industry and former CEO of four healthcare companies); Greczyn (the former CEO of Blue Cross Blue Shield of North Carolina); Shapiro (a Managing Partner of 7wire, a venture capital firm that invests in healthcare technology and education); Dr. Georgiou (the President of Georgiou Consulting LLC, a healthcare consulting company); and Hudson (the Managing Director of Alta Painter, a healthcare venture firm) – could not be trusted to exercise independent judgment. The Court disagrees.

As a preliminary matter, Defendants argue that Plaintiffs cannot establish director liability because they are asserting a claim within the holding of In re Caremark Int'l Inc. Derivative Litig., 698 A.2d 959, 971 (Del. Ch. 1996) (a "Caremark claim"),which "is possibly the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment," King v. Baldino, 648 F. Supp. 2d 609, 621 (D. Del. 2009) (citation omitted). In Caremark, the Delaware Chancery Court held that "where a claim of directorial liability for corporate loss is predicated upon ignorance of liability creating activities within the corporation, . . . a sustained or systematic failure of the board to exercise oversight – such as an utter failure to attempt to assure a reasonable information and reporting system exists – will establish the lack of good faith that is a necessary condition to liability." Whether Caremark applies is important because the imposition of liability "requires a showing that the directors knew that they were not discharging their fiduciary obligations." Stone, 911 A.2d at 370. Thus, "bad faith on the part of the corporation's directors is a necessary condition

to liability." Caremark, 698 A.2d at 971; see also Reiter on Behalf of Capital One Fin. Corp. v. Fairbank, No. CV 11693-CB, 2016 WL 6081823, at *7 (Del. Ch. Oct. 18, 2016) ("The Caremark liability standard is a high one, and requires proof that a director acted inconsistent with his fiduciary duties and, most importantly, that the director knew he was so acting."). Because Plaintiffs cannot show bad faith, Defendants submit that dismissal is warranted.

Having reviewed relevant Delaware case law, the Court concludes that whether Caremark was intended to apply to situations like the one presented here is open to question. On the one hand, the Delaware Supreme Court in Stone "h[e]ld that Caremark articulates the necessary conditions for assessing director oversight liability." Stone ex rel. AmSouth Bancorporation v. Ritter, 911 A.2d 362, 365 (Del. 2006). Indeed, "the Caremark standard for so-called oversight liability draws heavily upon the concept of director failure to act in good faith," and "[a] failure to act in good faith may be shown, for instance, . . . where the fiduciary intentionally fails to act in the face of a known duty to act, demonstrating a conscious disregard for his duties." Id. at 369; see also Melbourne Mun. Firefighters' Pension Tr. Fund on Behalf of Qualcomm, Inc. v. Jacobs, No. 10872-VCMR, 2016 WL 4076369, at *1 (Del. Ch. Aug. 1, 2016), aff'd, 158 A.3d 449 (Del. 2017) ("The crux of the plaintiff's complaint is that Qualcomm's board of directors breached its duty of loyalty because it was on notice as to corporate misconduct and consciously disregarded its duty to remedy or prevent such misconduct – i.e., what is known colloquially as a Caremark claim"). Lack of oversight is precisely what Plaintiffs are alleging here.

On the other hand, Caremark may be inapplicable because Plaintiffs are contending that the Board Members were aware of the alleged misstatements but nevertheless chose to ignore them, not that the Board failed to act due to ignorance. In this regard, Stone may be read as not expanding

14

Caremark because the plaintiffs in Stone "acknowledge[d] that the directors neither 'knew [n]or should have known that violations of law were occurring,' *i.e.*, that there were no 'red flags' before the directors," 911 A.2d at 364, whereas in Caremark, "review of directors liability was 'predicated upon ignorance of liability creating activities,' where there were no facts to indicate the directors 'conscientiously permitted a known violation of law by the corporation to occur.'" In re Abbott Labs. Derivative Shareholders Litig., 325 F.3d 795, 806 (7th Cir. 2003) (quoting Caremark at 971-72). This seems all the more clear considering that the Delaware Supreme Court in Stone repeated the statement later in its opinion that "Caremark articulates the necessary conditions predicate for director oversight liability," with oversight liability defined as "(a) the directors utterly failed to implement any reporting or information system or controls; or (b) having implemented such a system or controls, consciously failed to monitor or oversee its operations thus disabling themselves from being informed of risks or problems requiring their attention." Id. at 364. Here, the Directors were allegedly warned.

Ultimately, however, whether Caremark applies is irrelevant. This is because the Amended Complaint does not contain particularized facts creating a reason to doubt that a majority of the directors would have been independent and disinterested when considering a demand to pursue litigation, even though Plaintiffs believe the Amended Complaint does so in several ways.

The Amended Complaint alleges that the Tivity's Directors and Executives received millions of dollars in unjust compensation while breaching their fiduciary duties. Indeed, Count V is a claim for corporate waste. However, "[m]ere recitations of elephantine compensation packages and executive perquisites, however amusingly described, will rarely be enough to excuse a derivative plaintiff from the obligation to make demand upon a defendant board of directors. Sensational

allegations may be grist for the mill of business journalists, but a Court cannot declare a grant of executive compensation to be excessive without immediately inviting the subsequent question; 'How much is too much?'" In re INFOUSA, Inc. Shareholders Litig., 953 A.2d 963, 983 (Del. Ch. 2007). Thus, "under well-settled Delaware law, directors are only liable for waste when they "authorize an exchange that is so one sided that no business person of ordinary, sound judgment could conclude that the corporation has received adequate consideration." Glazer v. Zapata Corp., 658 A.2d 176, 183 (Del. Ch. 1993). "[S]ize and structure of executive compensation are inherently matters of judgment," and while "there are outer limits, . . . they are confined to unconscionable cases where directors irrationally squander or give away corporate assets." Brehm v. Eisner, 746 A.2d 244, 263 (Del. 2000). Nothing in the Amended Complaint suggests waste rising to that level.

Plaintiffs also submit that, despite its fiduciary duty to be truthful, "the Board was well aware that UHC intended to expand its internal fitness benefits program, thus decimating Tivity's relationship with one of its largest customers and significantly reducing Tivity's future revenues, growth prospects, and user base of its SilverSneakers program." They point to three factors in support:

> "First, and most critically, the Company's internal documents confirm that the Board knew that Tivity would lose significant market share to UHC's expanding program, Optum, while the Company continued to tout its contract with UHC and the strength of its revenues, growth prospects, and market position." (Doc. No. 47 at 13). This is based upon presentations to the [B]oard by Tramuto and Hargreaves between June and November 2017, and presentations made by J.P. Morgan during this time period.

> "Second, the Company's internal documents confirm that because contract renewals with UHC were a paramount concern upon which the Company's success hinged, the Board was regularly updated on the status of Tivity's negotiations with UHC." (Id. at 14). These presentations were purportedly made by Tramuto and other executives.

> Third, Tivity's internal documents emphasize that the SilverSneakers program, and Tivity's major client, UHC, were critical to Tivity's business and projected revenue,

and [b]oard knowledge is presumed under the 'core operations doctrine.'" (Id. at 21). This is because a presentation was made to the Board in April 2017 that stated UHC's enrollment in SilverSneakers contributed $94.6 million to Tivity's revenue, or 17% of the Company's total revenue [$556 million]" and provided significant revenue growth for Tivity. (Id. at 21-22).

In short, Plaintiffs argue that "[d]espite having knowledge that Tivity would be losing its major client, UHC, and significant revenue as a result, each of the Director Defendants knowingly approved and permitted false and misleading statements that concealed this critical information from the public" in breach of the fiduciary duties, including the duties of loyalty and candor. (Id. at 22).

Turning to the third point first, Plaintiffs cite In re Fitbit, Inc. Stockholder Deriv. Litig., No. CV-2017-0402-JRS, 2018 WL 6587159 (Del. Ch. Dec. 14, 2018) for the proposition that "the Delaware Court of Chancery recently affirmed that when information is critical to a company's business or goes to the company's bottom line, the 'core operations' doctrine will support 'a reasonable pleading stage inference' of knowledge." (Id. at 15). Actually, what the court said in a footnote was that "*[t]he totality of the facts Plaintiffs have pled with particularity* allow a reasonable pleading stage inference that, because the problems with PurePulse™ were profound and PurePulse™ drove the Company's bottom line [accounting for 80% of its revenue] , the Board knew of the alleged material, nonpublic information." 2018 WL 6587159, at *15, n.179 (emphasis added). The court also acknowledged that other cases "suggest that the doctrine is not sufficient *on its own* in the context of generally pled allegations to establish scienter." (Id.) (emphasis added).[2] Simply put, the court does not read Fitbit as allowing knowledge to be inferred in a derivative action based

---

[2] In fact, in declining an interlocutory appeal in that case, the Delaware Supreme Court noted that "the core operations doctrine was not, contrary to Fitbit's contention, the sole basis for the inference of scienter. Other facts supporting the reasonable inference of scienter included the nature, timing, and size of the offerings, the board's selective waiver of lock-up agreements, and the board's decision to lower Fitbit's allocation in the offerings, which led to more of the defendants' shares being sold." Fitbit, Inc. v. Agyapong, 202 A.3d 511 (Del. 2019).

simply on the core operations doctrine, even assuming some 17% of revenue can be considered core to the business operations. See In re Yahoo! Inc. S'holder Derivative Litig., 153 F. Supp. 3d 1107, 1123 (N.D. Cal. 2015) (stating that core operations doctrine "has no application in derivative litigation"); Kococinski v. Collins, 935 F. Supp. 2d 909, 921 (D. Minn. 2013) (noting that "some courts have determined that a core operations theory of proving knowledge is never applicable to outside directors"); In re Coinstar Inc. S'holder Derivative Litig., No. C11-133 MJP, 2011 WL 5553778, at *4 (W.D. Wash. Nov. 14, 2011) ("In a derivative actions like this, courts 'have repeatedly held that a plaintiff must allege more than that directors should have known or must have know about matters relating to the corporation's 'core business.'").

The core operations doctrine to the side, Plaintiffs neglect to adequately consider that the directors were covered by an exculpation clause in the Tivity's Article of Incorporation. Specifically, Article Seven provides:

> No director of the Corporation shall be personally liable to the Corporation or its stockholders for monetary damages for breach of fiduciary duty as a director, provided, however, that this provision shall not eliminate or limit the liability of a director (i) for any breach of the director's duty of loyalty to the Corporation or its stockholders, (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law, (iii) under Section 174 of the Delaware General Corporation Law or (iv) for any transaction from which the director derived an improper personal benefit.

(Doc. No. 40-1 at 5). In a footnote, Plaintiffs argue that this provision is no defense because Delaware, by statute, prohibits eliminating or limiting the liability of a director "'for any breach of the director's duty of loyalty to the corporation or its stockholders,'" (Doc. No. 45 at 18-19 n.11) (quoting 8 Del. C. §102(b)(7)), yet this is precisely the type of conduct that Tivity's Article Seven does not exculpate.

Regardless, "[w]here directors are contractually or otherwise exculpated from liability for

certain conduct, 'then a serious threat of liability may only be found to exist if the plaintiff pleads a non-exculpated claim against the directors based on particularized facts.'" <u>Wood</u>, 953 A.2d at 141 (quoting <u>Guttman v. Huang</u>, 823 A.2d 492, 501 (Del. Ch. 2003)). Thus, "[w]hen a director is protected by an exculpatory charter provision, a plaintiff can survive a motion to dismiss by that director defendant by pleading facts supporting a rational inference that the director harbored self-interest adverse to the stockholders interests, acted to advance the self-interest of an interested party from whom they could not be presumed to act independently, or acted in bad faith. But the mere fact that a plaintiff is able to . . . state a duty of loyalty claim against the interested fiduciaries, does not relieve the plaintiff of the responsibility to plead a non-exculpated claim against each director who moves for dismissal." <u>In re Cornerstone Therapeutics Inc, Stockholder Litig.</u>, 115 A.3d 1173, 1179–80 (Del. 2015); <u>see also</u>, <u>DiRienzo v. Lichtenstein</u>, No. CV 7094-VCP, 2013 WL 5503034, at *11 (Del. Ch. Sept. 30, 2013) ("A plaintiff may demonstrate that a director violated the duty of loyalty by alleging non-conclusory facts suggesting that the director has an improper self-interest in a transaction, lacked independence, or acted in bad faith.") (footnotes omitted). "In general, 'bad faith will be found if a fiduciary intentionally fails to act in the face of a known duty to act, demonstrating a conscious disregard for his duties.'" <u>In re Zale Corp. Stockholders Litig.</u>, No. CV 9388-VCP, 2015 WL 5853693, at *12 (Del. Ch. Oct. 1, 2015) (citation omitted); <u>see also</u> <u>In re Citigroup Inc. S'holder Derivative Litig.</u>, 964 A.2d 106, 125 (Del. Ch. 2009)(stating that "a plaintiff can thus plead bad faith by alleging with particularity that a director knowingly violated a fiduciary duty or failed to act in violation of a known duty to act, demonstrating a conscious disregard for her duties.").

Here, Plaintiffs have pled particularized facts that bring into question the neutrality of

Tramuto and Laughlin, but have not done so with regard to the other seven directors. Nor have they pled facts suggesting that those disinterested directors failed to act in the face of a known duty to act.

Moreover, a linchpin of Plaintiffs' claims is that the disinterested directors where somehow being disloyal when they knew that, as a result of UHC's entry into the market, Tivity's revenue would plummet and they did not tell shareholders. However, the minutes from relevant board meetings and the J.P. Morgan presentations on which Plaintiffs rely[3] do not paint a picture of doom and gloom.

For example, Plaintiffs contend that, at the June 9, 2017 Board meeting, the Directors were updated about the loss of certain markets because of UHC and that they "reviewed a long-range forecast by a financial advisor stating that UHC contract terms and revenues were reduced in 2018 based on 'specific actions and information from each client,' indicating 'further progressive reductions in 2019/2020' and including 'a full loss of those clients by 2021.'" (Doc. No. 47 at 5). This may be so, but it only tells part of the story because a June 2017 JP Morgan presentation showed that Tivity expected the SilverSneakers business to increase overall, with membership growth to increase 5.4% in 2018, 3% in 2019, a minuscule drop of 0.9% in 2020, followed by an increase of 8.1% and 8.0% for 2021 and 2022 respectively. (Doc. No. 57-1 at 7).

Plaintiffs also claim that at the June 20, 2017 meeting, Tramuto "led the Board in an update about recent discussions with executive leadership of one of the Company's largest customers and a recent loss of business," and that Hargreaves and the Board discussed the "recapture of members

---

[3] Board minutes and J.P. Morgan presentations are referenced in the Amended Complaint and are central to Plaintiffs's claims. As such they are properly considered on a Motion to Dismiss. Cataldo v. U.S. Steel Corp., 676 F.3d 542, 555 (6th Cir. 2012); Weiner v. Klais & Co., Inc., 108 F.3d 86, 89 (6th Cir. 1997).

expected to switch health plans as a result of a customer discontinuing offering the Silver Sneakers benefit and the Company's efforts to retain and/or recapture members." (Doc. No. 47 at 5). True enough, both the minutes from that meeting also showed that Tivity Management, while wanting to retain or recapture members, also had "confidence in the forecast for the growth rate for the Prime Fitness business." (Doc. No. 57-2 at 1).

Plaintiffs also claim that the October 12, 2017 Board meeting "confirmed the Company's downward revisions due to the loss of the UHC contract," with Tramuto describing communications with UHC regarding contract negotiations, noting that UHC had sent notice to some of its members that it was dropping the SilverSneakers in specific markets, and he and the board discussed the loss of additional markets and the impact on the Silversneaker's brand. (Doc. No. 47 at 12). Where the "downward revisions" comes from is unclear because it does not appear in the minutes. What the minutes do show is that Management and the Board discussed the communications from UHC, as well as "the value of the SilverSneakers brand, the strength of the national partner location network, and the value proposition to members of the partner location network[.]" Regardless, and not withstanding UHC's discontinuation of SilverSneakers for its members, Tivity's revenues grew from $404,263 million in 2014, to $452,092 million in 2015, to $500,998 million in 2016, to $566,942 million in 2017, and to $606,299 million in revenues in 2018. (Doc. No. 50-4 at 4).[4]

Finally, Plaintiff point out that in allowing the class action to go forward in Weiner v. Tivity, "the Court noted the following facts":

• The Officer Defendants were forwarded an aggressive letter from UHC to a fitness center, in the period between October to December 2016, stating that UHC was

_____

[4] This figures are from Form 10-K filings. On a motion to dismiss, "[c]ourts may take notice of documents in the public record such as SEC filings." Nisby v. Barden Mississippi Gaming, LLC, No. 06-2799 MA, 2008 WL 11415860, at *4 (W.D. Tenn. July 11, 2008) (collecting cases).

launching Optum Fitness Advantage and suggesting the fitness center would lose all SilverSneakers members.

• The Officer Defendants knew UHC would not renew its contract with SilverSneakers in at least New Jersey and Washington state.

• The Officer Defendants knew UHC was marketing Optum Fitness Advantage to partners outside New Jersey and Washington in early 2017.

• The Officer Defendants "formed a committee to develop a strategic plan . . . [to] combat UHC's competitive threat[,]" but the committee ultimately opted not publicly disclose their knowledge of UHC's plans.

• Hargreaves and Laughlin made "suspicious stock sales" – selling a massive percentage of their holdings in 2017, only a small portion of which was under the terms of a 10b-5 trading plan.

(Doc. No. 45 at 8-9).

The problem with any attempt to rely on the foregoing as support for this suit should be evident from the quotation itself. In <u>Weiner</u>, the Court was speaking about the knowledge and actions (or inactions) of the officer defendant, that is, Tramuto, Hargreaves and Adam Holland who replaced Hargreaves as the Chief Financial Officer. None of this suggests breach of a fiduciary duty or loyalty by Wills, Karro, Keckley, Greczyn, Shapiro, Dr. Georgiou, and Hudson could not be trusted to exercise independent judgment. While Laughlin (who served as a director member and was an activist investor) was mentioned in the prior opinion because he had engaged in suspicious stock sales, those same allegations lead the Court in this case to conclude that he may not be disinterested for purposes of a shareholder demand to file suit. This still leaves Plaintiffs three short of a majority, and their failure to make a demand unexcused.

### III.  Request for Leave to Amend

In a final footnote on the last page of their reply brief Plaintiffs request, almost as an afterthought, that "should the Motion to Dismiss be sustained in any part" they be "grant[ed] leave

to amend," citing only Rule 15(a)(2)'s provision that the court should freely grant leave when justice so requires. However, "[a] request for leave to amend 'almost as an aside, to the district court in a memorandum in opposition to the defendant's motion to dismiss is . . . not a motion to amend.' " La. Sch. Emps'' Ret. Sys. v. Ernst & Young, LLP, 622 F.3d 471, 486 (6th Cir.2010) (quoting Begala v. PNC Bank, Ohio, Nat'l Ass'n, 214 F.3d 776, 784 (6th Cir.2000)). "Plaintiffs are not entitled to a directive from the district court 'informing them of the deficiencies of the complaint and then an opportunity to cure those deficiencies.'" Graham v. Fearon, 721 F. App'x 429, 439 (6th Cir. 2018).

Plaintiffs already amended their complaint once. "If [they] wanted an opportunity to amend [the] complaint further, it was [their] responsibility to provide details concerning the proposed amendments. Absent such a showing, [they are] not entitled to an advisory opinion from the district court informing [them] of the deficiencies in [the] complaint and allowing [them] an opportunity to cure those deficiencies." Alexander v. Eagle Mfg. Co., LLC, 714 F. App'x 504, 511 (6th Cir. 2017); see also, Kuyat v. BioMimetic Therapeutics, Inc., 747 F.3d 435, 444 (6th Cir. 2014) ("Both because the plaintiffs did not present an adequate motion and because they did not attach a copy of their amended complaint, the district court did not abuse its discretion in refusing to allow the plaintiffs to amend their complaint based on the final sentence of the plaintiff's memorandum in opposition."). Plaintiffs' request for leave to amend will be denied.

## IV. Conclusion

The Court ends where it began. A shareholder securities action against Tivity was allowed to go forward because plaintiffs adequately pled materiality and scienter under the PLSRA, but a derivative action pursuant to Rule 23.1 is different. "[B]oth demand atypically rigorous pleading by plaintiffs," but "Rule 23.1 and the PSLRA create different pleading requirements." In re SAIC Inc.

Derivative Litig., 948 F. Supp. 2d 366, 384 (S.D.N.Y. 2013). Thus, " courts have determined that

demand is not excused as to claims arising from a companion securities class action where the

plaintiff failed to plead that a majority of the board faced a substantial likelihood of liability in the

securities class action." Advanced Advisors G. P. v. Berman, No. LACV1401420JAKSSX, 2014

WL 12772264, at *7–8 (C.D. Cal. Sept. 16, 2014) (collecting cases). As he Delaware Supreme

Court has noted:

> [T]here is a very large – though not insurmountable – burden on stockholders who
> believe they should pursue the remedy of a derivative suit instead of selling their
> stock or seeking to reform or oust . . . directors from office.
>
> Delaware has pleading rules and an extensive judicial gloss on those rules that must
> be met in order for a stockholder to pursue the derivative remedy. Sound policy
> supports these rules. . . [A] Complaint, which is a blunderbuss of a mostly
> conclusory pleading, does not meet that burden, and [is] properly dismissed.

Brehm, 746 A.2d at 267. The Amended Complaint in this case is not a blunderbuss, but it does fail

to set forth particularized facts showing that a *majority* of Tivity's Board would be incapable of

making an impartial decision regarding pursuit of a demand for litigation. Defendants' Motion to

Dismiss (Doc. No. 39) will therefore be granted.[5]

An appropriate Order will enter.

_____
WAVERLY D. CRENSHAW, JR.
CHIEF UNITED STATES DISTRICT JUDGE

---

[5] With the conclusion that demand should not be excused, the Court need not decide whether any of Plaintiffs' claims are sufficient to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure.